UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| FARMVILLE DISCOUNT DRUG, | ) | |
| INC. and ROBERT L. CROCKER, | ) | |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, complains and alleges as follows:

## INTRODUCTION

1.      For years, Defendants Farmville Discount Drug, Inc. and its owner and pharmacist-in-charge, Robert L. Crocker, repeatedly filled purported "prescriptions" in violation of the Controlled Substances Act.  These "prescriptions" often involved highly-abused opioid painkillers such as oxycodone, hydrocodone, hydromorphone, and methadone, along with other drugs like diazepam (*i.e.*, Valium), alprazolam (*i.e.*, Xanax), and zolpidem (*i.e.*, Ambien) that, when taken with opioids, heighten their potential for abuse and adverse events.

2.      Farmville Discount Drug shirked its responsibility as the last line of defense between powerful drugs with high potential for abuse and the people seeking them.  The warning signs were many, but Farmville Discount Drug ignored them.

1

Farmville Discount Drug filled prescriptions for dangerous, highly abused drug combinations for individuals who saw a doctor an hour away and lived an hour away. Farmville Discount Drug filled prescriptions for a prescriber that Crocker knew had been cut off by other pharmacies. Farmville Discount Drug filled controlled-substance prescriptions for people who hopped from doctor to doctor or pharmacy to pharmacy. Farmville Discount Drug filled hundreds of opioid prescriptions for multiple members of the same family under highly suspicious circumstances.

3. Employees expressed concern about these dispensing practices to Crocker, but he dismissed them, saying that if a doctor wrote the prescription, Farmville Discount Drug would fill it. This turn-a-blind-eye approach to pharmacy practice violated the Controlled Substances Act, and the United States now seeks civil penalties and permanent injunctive relief to hold Crocker and Farmville Discount Drug accountable for their actions and to prevent them from dispensing or distributing controlled substances in the future.

## PARTIES

4. Plaintiff is the United States of America ("United States").

5. Defendant Farmville Discount Drug, Inc. ("FARMVILLE DISCOUNT DRUG") is a corporation organized under the laws of North Carolina, with its principal place of business at 3708 North Main Street, Farmville, North Carolina 27828-1499.

6. At all times relevant to the allegations herein, FARMVILLE DISCOUNT DRUG was registered by the U.S. Drug Enforcement Administration

(the "DEA") as a Retail Pharmacy under registration number AF6883222 and was engaged in the business of operating a retail pharmacy in Farmville, North Carolina.

7.     Defendant Robert L. Crocker ("CROCKER") is a resident of the Eastern District of North Carolina.  At all times relevant to the allegations herein, CROCKER was a pharmacist duly licensed by the North Carolina Board of Pharmacy. CROCKER is the owner and pharmacist-in-charge of FARMVILLE DISCOUNT DRUG, meaning he was responsible for the active management of FARMVILLE DISCOUNT DRUG's pharmacy business, including the filling of prescriptions for controlled substances.

## JURISDICTION AND VENUE

8.     This is an action to enforce the provisions of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (the "CSA").  This Court has subject-matter jurisdiction over this action pursuant to 21 U.S.C. § 842(c)(1)(A), 21 U.S.C. § 882(a), 28 U.S.C. § 1345, and 28 U.S.C. § 1355.

9.     Venue is proper in the Eastern District of North Carolina under 21 U.S.C. § 842(c)(1)(A), 21 U.S.C. § 843(f)(2), 28 U.S.C. § 1395(a), and 28 U.S.C. §§ 1391(b), (c), and (d).

## LEGAL BACKGROUND

10.     The CSA and its implementing regulations set forth a comprehensive regulatory regime for the manufacture, distribution, and dispensing of controlled substances.  It is unlawful to manufacture, distribute, or dispense any controlled substance except in a manner authorized by the CSA or its implementing regulations.

3

11.     Under the CSA, controlled substances are categorized into five schedules based on several factors, including whether they have a currently accepted medical use in treatment in the United States, their relative abuse potential, and their likelihood of causing dependence when abused.

12.     Schedule II controlled substances have a currently accepted medical use in the United States, or a currently accepted medical use with severe restrictions; however, these substances also have a high potential for abuse, which may lead to severe psychological or physical dependence. *See* 21 U.S.C. § 812(b)(2). Examples of Schedule II controlled substances include opioid-based painkillers such as oxycodone, hydrocodone, and methadone.

13.     Schedule III controlled substances have a potential for moderate physical dependence or high psychological dependence, but less abuse potential than Schedule II substances. *See* 21 U.S.C. § 812(b)(3). Examples of Schedule III controlled substances include buprenorphine or products containing less than 90 milligrams of codeine.

14.     Schedule IV controlled substances may lead to physical or psychological dependence when abused, but the potential for abuse is less than Schedule III substances. *See* 21 U.S.C. § 812(b)(4). Examples of Schedule IV controlled substances include alprazolam (brand name Xanax), diazepam (brand name Valium), and lorazepam (brand name Ativan).

15.     To prevent the diversion of controlled substances, the CSA imposes requirements for the distribution and dispensing of these drugs. Among others, all

pharmacies wishing to distribute or dispense controlled substances first must register with DEA. *See* 21 U.S.C. § 822(a). Once registered, a pharmacy, as well as its agents and employees, are only permitted to distribute or dispense controlled substances to the extent authorized by their registration and in conformity with the CSA. *See* 21 U.S.C. § 822(b).

16.     The CSA defines dispensing to mean delivering a controlled substance to an ultimate user (*e.g.*, a patient) by, or pursuant to a lawful order of, a practitioner (*i.e.*, a prescription). *See* 21 U.S.C. § 802(10). Distributing means delivering a controlled substance other than by dispensing or administering. *See id.* § 802(11).

17.     The rules governing the issuance and filling of prescriptions are set forth in 21 U.S.C. § 829 and 21 C.F.R. Part 1306.

18.     Section 829 sets forth, among other things, the circumstances when a controlled substance may be dispensed pursuant to an oral or written prescription. Under 21 C.F.R. § 1306.04(a), a prescription for a controlled substance is valid only if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Along with the medical practitioner issuing the prescription, a pharmacist considering whether to fill the prescription bears a "corresponding responsibility" to ensure "the proper prescribing and dispensing of controlled substances." *Id.* Any "person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.* "Person" is defined to

include an individual, a corporation, a partnership, an association, and any other legal entity. 21 C.F.R. §§ 1300.01, 1306.02.

19. Under 21 C.F.R. § 1306.06, a pharmacist may only fill a controlled-substance prescription while "acting in the usual course of his professional practice." Among other things, acting in the usual course of pharmacy practice includes compliance with all relevant state laws and regulations. In North Carolina, a pharmacist "shall *not* fill or refill a prescription order if, in the exercise of professional judgment, there is or reasonably may be a question regarding the order's accuracy, validity, authenticity, or safety for the patient." 21 N.C. Admin. Code 46.1801(b) (emphasis added).

20. In assessing a prescription's legitimacy, a pharmacist looks to see whether it presents "red flags," or warning signs that create a reasonable suspicion that the prescription is not legitimate. "Red flags" may include the amount or combination of controlled substances prescribed; the abuse potential of those controlled substances; the temporal proximity to other prescriptions filled for the patient; the prescriber issuing the prescription in light of that prescriber's location, prescribing history with the patient, or general prescribing practices; or circumstances unique to the individual presenting the prescription.

21. When a "red flag" is present, a pharmacist must conduct further and sufficient inquiry to determine whether the controlled-substance prescription is legitimate. A pharmacist who fills a prescription in the face of one or more red flags without taking sufficient steps to resolve the red flags exceeds their authorization to

6

dispense controlled substances under the CSA, and subjects the pharmacist and the pharmacy to civil penalties.

## FACTUAL ALLEGATIONS

22. As a retail pharmacy, FARMVILLE DISCOUNT DRUG purchases, stores, and dispenses controlled substances. At all relevant times, FARMVILLE DISCOUNT DRUG and CROCKER were subject to the registration and dispensing requirements of Part C of the CSA, including 21 U.S.C. § 829.

**I. Defendants Systematically Ignored Red Flags When Filling Controlled-Substance Prescriptions.**

23. From on or about December 1, 2014 through at least as late as July 2019, Defendants knowingly filled prescriptions for controlled substances that presented significant red flags with respect to their medical legitimacy and/or with respect to whether they were written by a practitioner in the usual course of professional treatment. Defendants ignored and otherwise failed to take sufficient steps to resolve these red flags before filling the prescriptions.

### Red Flag No. 1: Geographic Distance

24. A person traveling an unusually long distance from their home address and/or their prescriber's office to fill a prescription, including traveling past multiple other pharmacies, can be a red flag that the prescription was not written for a legitimate medical purpose or in the usual course of professional practice.

25. Defendants repeatedly dispensed controlled substances, including opioids, to multiple people whose residential address and/or prescriber address were

7

more than fifty (50) miles from FARMVILLE DISCOUNT DRUG. It would have taken these individuals more than one hour to drive from their homes or from the distant prescriber's office to FARMVILLE DISCOUNT DRUG, passing dozens of pharmacies along the way.

## Red Flag No. 2:  Doctor Shopping

26.    A person's history of obtaining controlled substances from multiple prescribers is also a red flag that a controlled-substance prescription may not have been written for a legitimate medical purpose or in the usual course of professional treatment.  For example, a physician may stop writing prescriptions for a person if the physician believes the person is abusing substances, requiring the person to seek out prescriptions from other physicians.  Alternatively, a patient could move regularly from doctor to doctor to make it more difficult for any one prescriber to identify drug-seeking behavior.

27.    Seeking prescriptions from multiple prescribers is colloquially referred to as "doctor shopping."  Defendants had tools available to review a person's prescription history, including prescriber information, through North Carolina's Controlled Substance Reporting System.  Defendants nevertheless repeatedly dispensed opioids and other controlled substances to doctor-shopping individuals, including people who had received controlled-substance prescriptions from eleven or more prescribers in the previous five years, and to at least one person who had received controlled-substance prescriptions from nineteen separate prescribers during the previous five years.

**Red Flag No. 3: Pharmacy Shopping**

28.     A person's history of filling and attempting to fill prescriptions at multiple pharmacies is also a red flag that a controlled-substance prescription may not have been written for a legitimate medical purpose or in the usual course of professional treatment.  For example, pharmacies may stop filling for a prescriber whose prescribing practices themselves raise red flags, thereby requiring drug seekers to move from pharmacy to pharmacy to fill their prescriptions written by questionable prescribers.  Alternatively, pharmacy staff may recognize a person's drug-seeking behavior based on his or her prescription history and may stop filling for that person, requiring the person to seek to fill a prescription at another pharmacy.

29.     Filling prescriptions at multiple pharmacies is colloquially referred to as "pharmacy shopping."  Defendants had tools available to review an individual's prescription history, including the name of the pharmacy filling other prescriptions, through North Carolina's Controlled Substance Reporting System.  Defendants nonetheless repeatedly dispensed opioids and other controlled substances to pharmacy-shopping individuals, including to people who had filled controlled-substances at more than ten different pharmacies over a five-year period.

**Red Flag No. 4: Family Members & Individuals Residing at Same Address**

30.     The presentation of prescriptions for similar controlled substances by members of the same family or by individuals residing at the same address is also a red flag that the prescriptions may not have been written for a legitimate medical

9

purpose or in the usual course of professional treatment. Defendants repeatedly dispensed controlled substances, including many of the same drugs, to individuals of the same family and individuals sharing a common address.

### Red Flag No. 5: Pattern Prescribing

31.     A single prescriber who repeatedly issues prescriptions for the same drug or drug combinations to multiple people also raises a red flag that the prescriptions may not have been written for a legitimate medical purpose or in the usual course of professional treatment. This practice is colloquially referred to as "pattern prescribing." Defendants repeatedly dispensed the same drug and/or similar drug combinations prescribed by the same practitioner for multiple individuals (*i.e.*, pattern prescribing), including for individuals residing at the same address.

### Red Flag No. 6: Suspicious Drug Combinations

32.     Another red flag consists of prescriptions issued for combinations of drugs that are highly unlikely to serve a legitimate medical purpose and/or are known cocktails favored by drug abusers. For example, certain combinations of opioids and other controlled substances, such as benzodiazepines, muscle relaxers, sedatives, and/or stimulants, can enhance the effects of the substances, but also increase the risk of adverse events, such as overdose, to the user. Defendants repeatedly dispensed combinations of controlled substances whose medical legitimacy was suspect, including prescribing high doses of opioids combined with other opioids, benzodiazepines, muscle relaxers, or sedatives.

**Red Flag No. 7:  Early Fills of Schedule II and Schedule IV Drugs**

33.     A person's attempt to fill a prescription early—*i.e.*, before their current supply of drugs from a previous prescription is exhausted—is also a red-flag that a controlled-substance prescription may not have been written for a legitimate medical purpose or in the usual course of professional treatment.  A review of dispensing data suggests that Defendants repeatedly dispensed controlled substances early.  For example, on more than 150 occasions, and for multiple individuals, Defendants appear to have dispensed Schedule II and Schedule IV controlled substances more than five days early, and on some occasions, more than twenty days early.

**II.     Many Individuals Presented Multiple Red Flags**

34.     In many cases, the foregoing red flags were not presented to Defendants in isolated fashion.  Rather, Defendants ignored numerous red flags presented by the same person or prescription.  The following examples illustrate the extent to which Defendants repeatedly failed to resolve multiple red flags in filling prescriptions for powerful and often-abused controlled substances.

**Individuals A and B**

35.     FARMVILLE DISCOUNT DRUG filled eighty-one (81) controlled-substance prescriptions for Individual A between 2015 and 2018.

36.     During this time, Individual A lived in New Bern, North Carolina at an address approximately sixty (60) miles from FARMVILLE DISCOUNT DRUG.  All 81 prescriptions were written by a prescriber located in New Bern, North Carolina, approximately fifty-three (53) miles from FARMVILLE DISCOUNT DRUG.

37.     In the eighteen months before coming to FARMVILLE DISCOUNT DRUG, Individual A had filled controlled-substance prescriptions at four separate pharmacies.  But beginning in 2015, Individual A began regularly filling prescriptions at FARMVILLE DISCOUNT DRUG and continued to do so for nearly three and a half years.

38.     Approximately 77% of the prescriptions Individual A filled at FARMVILLE DISCOUNT DRUG were for 30-mg oxycodone tablets, the highest strength immediate-release oxycodone tablet available.  At one point, FARMVILLE DISCOUNT DRUG dispensed *four* thirty-day supplies of 30-mg oxycodone tablets (720 tablets) for Individual A in just sixty-six (66) days.  Specifically, FARMVILLE DISCOUNT DRUG dispensed 180 tablets of 30-mg oxycodone to Individual A on December 5, 2016; another 180 tablets on December 15, 2016; another 180 tablets on January 12, 2017; and another 180 tablets on February 9, 2017.

39.     FARMVILLE DISCOUNT DRUG often dispensed oxycodone to Individual A in combination with other opioids (such as 5-mg or 10-mg methadone) or muscle relaxers (such as 350-mg carisoprodol).  For three months in a row, FARMVILLE DISCOUNT DRUG filled thirty-day supplies of all three drugs on the same day—180 tablets of 30-mg oxycodone, 30 tablets of 10-mg methadone, and 60 tablets of 350-mg carisoprodol.  Taken together, these drugs increased the euphoric effects of each other and potential for abuse.  However, because of the combined depressant effects of these drugs on the central nervous system, the combination also produced a heightened risk of death or overdose.  For example, although the Centers

for Disease Control and Prevention ("CDC") urge caution when an individual receives an opioid dosage greater than 90 morphine milligram equivalents (MME) per day, Individual A received more than 300 MME per day from the oxycodone and methadone in these prescriptions *before* adding the potentiating (and central-nervous-system depressing) effects of carisoprodol.

40.     FARMVILLE DISCOUNT DRUG also filled thirty-four (34) prescriptions for Individual B between May 2017 and October 2018.  Individual B shares the same last name as Individual A and resided at the same address as Individual A for some period of time—the address that was approximately sixty (60) miles from FARMVILLE DISCOUNT DRUG.  Individual B sometimes resided at a different address; however, that address was also approximately forty-six (46) miles from FARMVILLE DISCOUNT DRUG and would have required approximately one hour to drive from the address to FARMVILLE DISCOUNT DRUG.

41.     In addition, all of the prescriptions Individual B filled at FARMVILLE DISCOUNT DRUG were written by the same prescriber located in New Bern, North Carolina, who issued Individual A's prescriptions.

42.     Thirty-three (33) of the thirty-four (34) prescriptions that FARMVILLE DISCOUNT DRUG filled for Individual B were for 30-mg oxycodone tablets—the same drug and strength that Individual A was receiving.  During the period when both Individual A and Individual B were receiving 30-mg oxycodone from FARMVILLE DISCOUNT DRUG, Individual A received 3,108 tablets of 30-mg

oxycodone, and Individual B received 2,590 tablets of 30-mg oxycodone, for a total of 5,698 tablets of oxycodone between them.

43. Upon information and belief, FARMVILLE DISCOUNT DRUG dispensed controlled substances to Individual A and Individual B without taking necessary and sufficient steps to resolve the red flags raised by the prescriptions presented for filling at the pharmacy.

**Individuals C and D**

44. FARMVILLE DISCOUNT DRUG filled seventy-five (75) prescriptions for Individual C and 110 prescriptions for Individual D. Individual C and Individual D share the same last name and have resided at the same addresses.

45. Individuals C and D were pharmacy shoppers. While receiving controlled substances from FARMVILLE DISCOUNT DRUG, Individual C also filled controlled-substance prescriptions at three other pharmacies. Likewise, Individual D used at least three pharmacies to fill prescriptions in the months before and during the time Individual D filled at FARMVILLE DISCOUNT DRUG.

46. Individuals C and D at all times resided at least approximately forty-nine (49) miles from FARMVILLE DISCOUNT DRUG, and all of the prescriptions filled by both Individual C and Individual D were written by the same prescriber in New Bern, North Carolina who wrote prescriptions for Individuals A and B—approximately fifty-three (53) miles from FARMVILLE DISCOUNT DRUG.

47. Beginning in December 2014, Individual C began regularly filling prescriptions at FARMVILLE DISCOUNT DRUG. Every month for nearly two years,

14

Individual C, who was in their twenties, filled a prescription for 240 tablets of 15-mg oxycodone and 60 tablets of 10-mg diazepam tablets.

48.     Diazepam, sold under the brand name Valium, is a benzodiazepine. When taken with opioids, a benzodiazepine like diazepam enhances the euphoric effect of the opioid. They are also, like opioids, central nervous system depressants. Both the CDC and the U.S. Food and Drug Administration ("FDA") have noted the heightened risk of respiratory depression and overdose when taking opioids and benzodiazepines concurrently.

49.     Beginning in November 2016, Individual C stopped receiving the benzodiazepine, but continued receiving 15-mg oxycodone tablets every month for the next roughly two years.

50.     Meanwhile, Individual D, also in their twenties, filled dozens of prescriptions at FARMVILLE DISCOUNT DRUG from the *exact same prescriber* and for the *exact same drugs*, albeit in slightly different quantities.

51.     Beginning in December 2014, Individual D began regularly filling prescriptions at FARMVILLE DISCOUNT DRUG. For each of the first two months, Individual D filled a prescription for 120 tablets of 15-mg oxycodone and 30 tablets of 5-mg diazepam. Then, approximately every month for the following two years, FARMVILLE DISCOUNT DRUG dispensed to Individual D the exact same drugs dispensed to Individual C—15-mg oxycodone (120 tablets) and 10-mg diazepam (60 tablets). This general pattern continued, with small variation, through October 2018.

52.     In total, between December 2014 and October 2018, FARMVILLE DISCOUNT DRUG dispensed a total of 17,380 15-mg oxycodone tablets and 3,570 10-mg diazepam tablets to Individuals C and D.

53.     Upon information and belief, FARMVILLE DISCOUNT DRUG dispensed controlled substances to Individual C and Individual D without taking necessary and sufficient steps to resolve the red flags raised by the prescriptions presented for filling at the pharmacy.

## Individual E

54.     FARMVILLE DISCOUNT DRUG filled forty-four (44) prescriptions for Individual E during a period of approximately fifteen months.

55.     Individual E resided approximately fifty-six (56) miles from FARMVILLE DISCOUNT DRUG, and it would have taken Individual E approximately one hour and ten minutes to drive to FARMVILLE DISCOUNT DRUG.  Furthermore, nearly all of the prescriptions Individual E filled at FARMVILLE DISCOUNT DRUG were written by a prescriber located in New Bern, North Carolina, approximately fifty-three (53) miles from FARMVILLE DISCOUNT DRUG.

56.     Before filling at FARMVILLE DISCOUNT DRUG, Individual E utilized at least four other pharmacies to fill controlled-substance prescriptions.

57.     On March 18, 2016, Individual E filled a prescription for 30-mg oxycodone at FARMVILLE DISCOUNT DRUG, the highest strength of immediate-release oxycodone available.  Beginning on April 14, 2016, FARMVILLE DISCOUNT

16

DRUG dispensed to Individual E a combination of three drugs—180 tablets of 30-mg oxycodone, 60 tablets of 4-mg hydromorphone, and 60 tablets of 10-mg diazepam. Individual E filled the identical combination eleven more times thereafter. On March 17, 2017, Individual E received the same combination of the three drugs from FARMVILLE DISCOUNT DRUG, although only thirty tablets of hydromorphone and diazepam (rather than sixty).

58.     Taken together, these three central nervous depressants (two of which are powerful opioids) produced a heightened risk of death or overdose. For comparison's sake, the oxycodone and hydromorphone prescribed for Individual E in these prescriptions was 302 MME per day—more than three times the CDC's guideline for concern at 90 MME—every day, for more than a year, and *before* adding the potentiating (and central-nervous-system depressing) effects of the 10-mg diazepam, the highest oral strength available for that drug.

59.     Upon information and belief, FARMVILLE DISCOUNT DRUG dispensed controlled substances to Individual E without taking necessary and sufficient steps to resolve the red flags raised by the prescriptions presented for filling at the pharmacy.

### Individual F

60.     FARMVILLE DISCOUNT DRUG filled seventeen (17) prescriptions for Individual F between November 2016 and July 2017.

61.     Individual F's address was approximately eighty-three (83) miles from FARMVILLE DISCOUNT DRUG, and it would have taken Individual F

17

approximately one hour and forty-two minutes to drive to FARMVILLE DISCOUNT DRUG.

62. All seventeen (17) of the prescriptions filled by Individual F at FARMVILLE DISCOUNT DRUG were written by a prescriber located in New Bern, North Carolina, approximately fifty-three (53) miles from FARMVILLE DISCOUNT DRUG.

63. Before arriving at FARMVILLE DISCOUNT DRUG and between August 2013 and November 2016, Individual F had filled prescriptions at sixteen (16) separate pharmacies in various locations around eastern North Carolina, including Kinston, Morehead City, Beaufort, Swansboro, Jacksonville, and New Bern.

64. Between August 2013 and November 2016, Individual F had obtained controlled-substances prescriptions from at least seven different prescribers in various locations around eastern North Carolina, including Raleigh, New Bern, Morehead City, Arden, Jacksonville, and Kinston. One of the prescribers from whom Individual F obtained controlled-substances prescriptions (including prescriptions for Schedule II and Schedule IV drugs) in the 2013–2014 timeframe, Dr. Douglas Watford, was convicted on April 8, 2016 in the Eastern District of North Carolina for illegally distributing controlled substances.

65. The seventeen (17) prescriptions filled for Individual F by FARMVILLE DISCOUNT DRUG included combinations of three drugs—8-mg Buprenorphine, 350-mg Carisoprodol, and 30-mg Dextroamphetamine-amphetamine. Buprenorphine is an opioid commonly used to treat opioid addiction, as well as acute pain and chronic

pain. Carisoprodol is a muscle-relaxer commonly paired by drug abusers with opioids. Dextroamphetamine-amphetamine, commonly sold under the brand name Adderall, is a Schedule II stimulant. Combining these drugs increases the risk of overdose and death, particularly because the stimulant may lessen the perceived and/or desired depressive effects of the opioid and muscle-relaxer, causing one to take more of the opioid and muscle-relaxer to achieve the desired effects.

66. Upon information and belief, FARMVILLE DISCOUNT DRUG dispensed controlled substances to Individual F without taking necessary and sufficient steps to resolve the red flags raised by the prescriptions presented for filling at the pharmacy.

### Individuals G, H, I, and J

67. Between December 2014 and July 2019, FARMVILLE DISCOUNT DRUG filled 289 prescriptions for Individual G, 188 prescriptions for Individual H, 182 prescriptions for Individual I, and sixty-seven (67) prescriptions for Individual J. All four individuals share the same last name. Upon information and belief, all four individuals are members of the same family. Individual G and Individual H reside at the same address. Individual I and Individual J reside at the same address. These two addresses are located on the same street.

68. During the period of time FARMVILLE DISCOUNT DRUG filled prescriptions for Individual G, Individual G utilized at least six other pharmacies to fill prescriptions for controlled substances. Also during this period, Individual G

obtained prescriptions for controlled substances from at least eight different prescribers.

69. Similarly, during this general period of time, Individual H utilized at least four other pharmacies besides FARMVILLE DISCOUNT DRUG to fill prescriptions for controlled substances, and obtained controlled-substances prescriptions from at least twelve different prescribers.

70. During this same period, Individual I utilized at least five other pharmacies besides FARMVILLE DISCOUNT DRUG to fill prescriptions for controlled substances, and obtained controlled-substances prescriptions from at least twelve different prescribers.

71. During this same period, Individual J utilized at least one additional pharmacy besides FARMVILLE DISCOUNT DRUG to fill prescriptions for controlled substances, and obtained controlled-substances prescriptions from at least eleven different prescribers.

72. FARMVILLE DISCOUNT DRUG dispensed a significant volume of opioids to these four family members. Between 2014 and 2019, FARMVILLE DISCOUNT DRUG dispensed more than 55,225 dosage units of opioids to Individuals G, H, I, and J, including oxycodone, oxymorphone, fentanyl, and hydrocodone.

73. FARMVILLE DISCOUNT DRUG also regularly dispensed other drugs to Individuals G, H, I, or J that created heightened risks of abuse, overdose, or death, including benzodiazepines (such as lorazepam, alprazolam, and/or diazepam) or sedatives (such as zolpidem). For example, within a single 30-day period in December

2018 and January 2019, FARMVILLE DISCOUNT DRUG dispensed the following drugs to Individual I on the following dates:

| Fill Date | Drug | Quantity |
|---|---|---|
| 12/11/2018 | Oxycodone 20-mg | 120 tablets |
| 12/11/2018 | Oxymorphone Extended Release 40-mg | 120 tablets |
| 12/28/2018 | Zolpidem 10-mg | 30 tablets |
| 12/28/2018 | Oxycodone 20-mg | 120 tablets |
| 1/10/2019 | Oxymorphone Extended Release 40-mg | 120 tablets |
| 1/11/2019 | Lorazepam 1-mg | 15 tablets |

74.     Individuals G, H, I, and J also had a lengthy history of filling Schedule II and Schedule IV prescriptions significantly early. FARMVILLE DISCOUNT DRUG dispensed Schedule II drugs to each individual at least seven days early on one or more occasions, and Individual I obtained dozens of early fills for both Schedule II and Schedule IV drugs—many of which were twenty days or more early.

75.     Upon information and belief, FARMVILLE DISCOUNT DRUG dispensed controlled substances to Individuals G, H, I, and J without taking necessary and sufficient steps to resolve the red flags raised by the prescriptions presented for filling at the pharmacy.

**III.    Defendants Dismissed Concerns Raised by Other Employees.**

76.     Multiple FARMVILLE DISCOUNT DRUG employees expressed concerns about many of the above-described red flags directly to CROCKER. Specifically, FARMVILLE DISCOUNT DRUG employees expressed concerns over prescriptions written for multiple people by a distant prescriber and about filling high-powered opioid prescriptions for members of the same family. CROCKER was

also aware that pharmacies closer to the New Bern prescriber's location had stopped filling prescriptions for the distant prescriber.

77. Ultimately, CROCKER dismissed these concerns. As he stated to an employee, if a doctor wrote the prescription, FARMVILLE DISCOUNT DRUG would fill it.

## CIVIL PENALTY LIABILITY
### 21 U.S.C. § 842(a)(1)

78. The United States re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

79. 21 U.S.C. § 842(a)(1) makes it unlawful for any person subject to Part C of the CSA to distribute or dispense a controlled substance in violation of 21 U.S.C. § 829. As a DEA registrant and owner-manager of a registrant dispensing controlled substances, respectively, FARMVILLE DISCOUNT DRUG and CROCKER are subject to Part C of the CSA.

80. Defendants violated 21 U.S.C. § 829 by filling prescriptions for Schedule II, III, or IV controlled substances that also were prescription drugs under the Federal Food, Drug, and Cosmetic Act, outside the usual course of pharmacy practice and not in compliance with their "corresponding responsibility." 21 C.F.R. §§ 1306.04 and 1306.06.

81. Namely, in an amount to be determined at trial, and upon information and belief, Defendants filled prescriptions without resolving one or more red flags indicating that such prescriptions were not written for a legitimate medical purpose or in the usual course of professional treatment.

22

82.     Under 21 U.S.C. § 842(c)(1)(A) and 28 C.F.R. § 85.5, each violation of 21 U.S.C. § 842(a)(1) subjects Defendants to a civil penalty of not more than $25,000.00 for violations occurring on or before November 2, 2015, and not more than $64,820.00 for violations occurring after November 2, 2015.

## PERMANENT INJUNCTIVE RELIEF
### 21 U.S.C. §§ 843(f)(1) and 882(a)

83.     The United States re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

84.     Under 21 U.S.C. § 843(f), the Attorney General of the United States is authorized to seek appropriate declaratory or injunctive relief relating to violations of 21 U.S.C. § 842.  More broadly, 21 U.S.C. § 882(a) provides for any violation of the CSA to be enjoined.

85.     Based on the violations set forth herein and Defendants' years-long pattern of conduct, the United States requests that the Court enter a permanent injunction (i) prohibiting Defendants from administering, dispensing, or distributing any controlled substance; (ii) requiring Defendants to surrender FARMVILLE DISCOUNT DRUG's current DEA Certificate of Registration for cause; (iii) prohibiting Defendants from applying for or seeking renewal of any DEA Certificate of Registration on Defendants' behalf or on behalf of any corporate entity; and (iv) prohibiting CROCKER from applying for or seeking renewal or reinstatement of a license or certificate to practice pharmacy anywhere in the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of the United States and against Defendants as follows:

1. Impose civil penalties up to the maximum amount allowed by law for each violation of 21 U.S.C. § 842(a)(1) committed by Defendants;

2. Enter a permanent injunction (i) prohibiting Defendants from administering, dispensing, or distributing any controlled substance; (ii) requiring Defendants to surrender FARMVILLE DISCOUNT DRUG's current DEA Certificate of Registration for cause; (iii) prohibiting Defendants from applying for or seeking renewal of any DEA Certificate of Registration on Defendants' behalf or on behalf of any corporate entity; and (iv) prohibiting CROCKER from applying for or seeking renewal or reinstatement of a license or certificate to practice pharmacy anywhere in the United States;

3. Award the costs associated with the investigation, prosecution, and collection of the penalties and other relief in this matter; and

4. Award any other relief deemed just by the Court.

**[*Remainder of Page Left Intentionally Blank*]**

Respectfully submitted this the 29th day of January, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

BY:    /s/ John E. Harris

C. MICHAEL ANDERSON
Assistant United States Attorney
N.C. State Bar No. 42646
JOHN E. HARRIS
Assistant United States Attorney
NC State Bar No. 49253
Civil Division
150 Fayetteville Street
Suite 2100
Raleigh, NC  27601-1461
Telephone:  (919) 856-4530
Facsimile:  (919) 856-4821
E-mail: michael.anderson7@usdoj.gov
          john.harris5@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

DAVID M. MORRELL
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

JILL P. FURMAN
Assistant Director

BY:    /s/ James W. Harlow
          JAMES W. HARLOW
          Trial Attorney
          Consumer Protection Branch
          U.S. Department of Justice
          P.O. Box 386
          Washington, DC  20044-0386
          Telephone:  (202) 514-6786
          Facsimile:  (202) 514-8742
          E-mail: james.w.harlow@usdoj.gov
          Maryland Bar (no numbers issued)